HON. DAVID NORIEGA RODRÍGUEZ, demandante y apelado, *v.* HON. RAFAEL HERNÁNDEZ COLÓN y OTROS, demandados y apelantes; GRACIANY MIRANDA MARCHAND, demandante y apelado, *v.* CARLOS LÓPEZ FELICIANO y OTROS, demandados y apelantes.

*Número:* CE-87-665 *Resuelto:* 12 de enero de 1988

*Rafael Ortiz Carrión, Procurador General* y *Lorenzo Vilanova Alfonso, Procurador General Auxiliar*, abogados de los apelantes. *Juan José Nazario De la Rosa, Luis Rivera Lacourt, Juan Santiago Nieves* y *Armando De León Vargas*, abogados del apelado; *Rafael Rivera Rosa*, de *Rivera Rosa & Díaz Maysonet*, abogados del apelado.

PER CURIAM: El pasado 5 de noviembre de 1987 dimos curso a la apelación incoada por el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Rafael Hernández Colón, que cuestiona la sentencia del Tribunal Superior, Sala de San Juan, y los remedios provistos para examinar y disponer de los expedientes sobre personas y organizaciones, preparados durante varias décadas por la División de Inteligencia de la Policía de Puerto Rico únicamente por razón de los principios políticos e ideológicos de los afectados.

El 13 de noviembre del mismo año uno de los demandantes apelados, Hon. David Noriega Rodríguez, presentó una moción titulada "Moción sobre Recusación del Juez Presidente, Honorable Víctor M. Pons Núñez". En esencia expresa que el Juez Presidente debe inhibirse de entender en la apelación sometida por razón de haber servido como Secretario de Estado entre 1973 y 1974, por lo que "existe una alta probabilidad o al menos se crea una apariencia razonable" de que tenía o debió tener conocimiento de los "hechos pertinentes a este caso y de los diversos puntos de vista en cuanto a sus méritos". La moción de inhibición no expresa hecho específico alguno sobre la probabilidad o apariencia alegada ni se acompañan documentos a esos efectos.

Por su parte, el otro demandante apelado, Lcdo. Graciany Miranda Marchand, oportunamente presentó una mo-

ción informativa que exponía que no tenía "conocimiento de hecho alguno que justifique la solicitud de inhibición ni puede emitir juicio sobre sus méritos jurídicos a base de lo publicado en la prensa, por lo cual desea informar que no se une ni apoya la misma".

## I

Nuestra intervención en esta etapa no tiene el propósito de pasar juicio sobre los méritos de la moción del apelado Noriega Rodríguez. En el pasado solamente en una ocasión nos hemos pronunciado de forma colegiada sobre la procedencia de una recusación de uno de los miembros de este Tribunal. *In re Solicitud de Lugo Bougal y Arraiza*, 112 D.P.R. 134 (1982). Sin embargo, en esa ocasión no nos expresamos sobre a quién corresponde resolver una solicitud de inhibición, ¿es al Juez recusado o al Tribunal en Pleno?

La cuestión amerita un cuidadoso análisis institucional y una exposición sobre los procedimientos de recusación de los miembros de este Foro. No estamos ante normas sencillas y constantes. Distintos factores, tradiciones, condiciones jurídicas y principios de organización judicial hacen más complejo el análisis. Anteriormente la cuestión de abstención y recusación ha girado en torno al aspecto de las "causales". Véanse: Código de Enjuiciamiento Civil de 1933, Arts. 23–25 y Reglas de Procedimiento Civil de 1958, Rs. 63.1–63.3. Aunque mucho se ha escrito sobre las causas y criterios de inhibición, la literatura sobre el *procedimiento* de recusación de magistrados de tribunales apelativos es muy escasa.

El derecho comparado tampoco nos ofrece amplitud de fórmulas. En España, por ejemplo, el procedimiento de recusación es complicado. En términos generales se trata de un sistema que se caracteriza por otorgar amplio margen de discreción a los jueces. L. Prieto-Castro y Ferrándiz, *Tribunales Españoles: Organización y funcionamiento*, Madrid,

Ed. Tecnos, 1979, págs. 77–78. No se fijan causas de exclusión de pleno derecho, sino de abstención. Las causas que permiten al juez a abstenerse son las mismas que puede esgrimir la parte como causa de recusación. Véanse, en general, G. Brocá y Montagut, *Práctica Procesal Civil*, Manual de Formularios Civiles, Barcelona, Casa Ed. Bosch, 1975, T. I, pág. 283 *et seq.*; A. De la Oliva Santos, *Lecciones de Derecho Procesal*, Barcelona, Promociones Publicaciones Universitarias, 1985, pág. 264 *et seq.*; M. Alsina, *Tratado teórico práctico de derecho procesal civil y comercial*, Buenos Aires, Ediar Soc. Anon. Editores, 1957, pág. 281 *et seq.*

Fuera de estas grandes líneas y categorías, el estudio del derecho continental europeo desborda el marco de nuestra experienca política y jurídica reciente. A pesar de ciertas similitudes técnicas, estamos ante otro tipo de jerarquía orgánica. La organización del Poder Judicial no responde generalmente a la clásica teoría de división de poderes. Aun el sistema francés, prototipo del europeo, difiere del nuestro en aspectos básicos. La magistratura forma parte de una carrera "administrativa" a la que se ingresa mediante un concurso técnico y burocrático. J.J. Toharia, *El Juez Español*, Madrid, Ed. Tecnos, 1975, págs. 21–25; C. Rodríguez Aguilera, *Notas sobre Organización Judicial*, 188 Rev. Gen. Leg. Jur. 419 (1950).

Esta realidad histórica nos obliga a acudir a otras fuentes comparativas. En Estados Unidos tanto el Tribunal Supremo federal como los tribunales apelativos de los distintos estados funcionan según reglas de su propia adopción. Sin embargo, la materia de recusación de sus jueces escapa al puro régimen reglamentario.

Al igual que ocurre en los países de tradición civilista, poco se ha escrito en torno a los procedimientos que siguen estos altos foros para la inhibición de sus jueces. Existen dos fórmulas fundamentales: la primera defiende la tesis de que incumbe exclusivamente a la esfera interna de la conciencia

judicial individual la decisión en materia de inhibición. Según esta primera tendencia, se trata de una grave cuestión de libertad individual. Aunque los casos sean poco abundantes, la tendencia general se mueve en esta dirección. Véanse: *State Ex. Rel. Cohen* v. *Manchin*, 336 S.E.2d 171 (W. Va. 1984); *State Ex Rel. Matko* v. *Ziegler*, 179 S.E.2d 735, 737 (1971); *In re State of Carlton*, 378 So. 2d 1212, 1216 (Fla. 1979); *Giuliano* v. *Wainwright*, 416 So. 2d 1180 (Fla. Dist. Ct. App. 1982); J.E. Frank, *Disqualification of Judges*, 56 Yale L.J. 605, 612 (1947), J.E. Frank, *Commentary on Disqualification of Judges—Canon 3C*, 1972 Utah L. Rev. 377 (1972). Véanse, también: *State Ex Rel. Wild* v. *Otis*, 257 N.W.2d 361 (1977); *Reilly By Reilly* v. *Southeastern Pa. Transp.*, 489 A.2d 1291 (1985); *American Medical Intern.* v. *Scheller*, 462 So. 2d 1 (1984); *Florida Patient's Comp. Fund.* v. *Von Stetina*, 474 So. 2d 783 (1985); *Department of Revenue* v. *Leadership Housing, Inc.*, 322 So. 2d 7 (1975); *García* v. *Superior Court (people)*, 203 Cal. Rptr. 290 (1984); *Kaufman* v. *Court of Appeal, etc.*, 647 P.2d 1081 (1982).

Una vez el Juez toma una decisión en materia de inhibición el dictamen cobra carácter de cosa juzgada por así decirlo. Se ha interpretado que ésta no es susceptible de reconsideración por el Pleno. A título indicativo en *Department of Revenue* v. *Leadership Housing, Inc.*, supra, pág. 9, se expresó:

> La orden del Juez Asociado England sobre la cuestión de su inhibición entra en un área de la ley históricamente considerada como personal y discrecional de los miembros individuales de la judicatura, incluso aquellos que son parte de tribunales colegiados. Para fines de las reglas que rigen la reconsideración, una decisión de esa naturaleza tiene la misma dignidad que una decisión u orden del Tribunal en Pleno en áreas del derecho que caen dentro de su jurisdicción colegiada apelativa. (Traducción nuestra.)

La Asociación Americana de Abogados (A.B.A.) en los comentarios a la Sec. 3.42 (*disqualification of Judges*) de los llamados *Standards of Judicial Administration . . . Relating to Appellate Courts* (1977), favorece que los incidentes de recusación en los tribunales de última instancia y apelativos intermedios sean decididos por el mismo juez afectado.

Algunas jurisdicciones permiten la recusación perentoria del juez de instancia. Véase Comentario de la Sec. 2.32(b), Normas sobre Tribunales de Primera Instancia. Este procedimiento no es el apropiado en el caso de Jueces apelativos. En el proceso decisorio colegiado de un Tribunal apelativo, los puntos de vista puramente personales del Juez individual tienen menos importancia que la que tendrían en un tribunal de instancia. Si el Juez se inclinara a seguir sus puntos de vista personales, estará sujeto a las limitaciones que le impone el Foro colegiado. Un Juez apelativo tiene pocas oportunidades para ejercer la amplia discreción que tiene el juez de instancia, y en la litigación apelativa no hay oportunidad para que surja la intensa interacción personal entre el juez y los abogados y litigantes que podría surgir en un tribunal de instancia. Es más, los puntos de vista ya establecidos que pueda tener un Juez apelativo sobre el derecho y la justicia, por lo menos hasta cierto punto, son un elemento apropiado de su contribución al funcionamiento del Tribunal apelativo, particularmente en lo que se refiere al desarrollo del derecho. Una recusación perentoria podría ser utilizada abusivamente para excluir a un Juez por el mero hecho de que un litigante no esté de acuerdo con sus puntos de vista. (Traducción nuestra.)

Otras jurisdicciones menos numerosas adoptan el segundo modelo. Los incidentes de recusación son decididos por el tribunal en reunión plenaria. Véanse: *Mosk* v. *Superior Court of Los Angeles Cty.*, 601 P.2d 1030, 1034 n. 2 (1979); *Board of Justices* v. *Fennimore*, 1 N.J.L. 190 (1878); *State* v. *Martin*, 256 P. 681 (1927); *State* v. *Sage Stones*, 143 P.2d 652 (1943).

En el plano doctrinal, esta concepción ha recibido un duro ataque. Preocupa la posibilidad de que bajo el pretexto

de la ética colectiva, y por encima de la voluntad y conciencia del Juez afectado, se esconda la práctica de descalificación de Jueces al amparo de una mayoría numérica por rázon de simples diferencias filosóficas, políticas y hasta personalistas. E.G. Burg, *Meeting the Challenge: Rethinking Judicial Disqualification,* 69 Calif. L. Rev. 1445, 1465 (1981).

Por ejemplo, en *Olson* v. *Côry,* 609 P.2d 991, 1024 (1980), en ocasión de la recusación en bloque de los Jueces del Tribunal Supremo de California por estar en controversia aspectos de la retribución salarial de la Rama Judicial, se hicieron expresiones en el proceso que ejemplifican el temor.

> Debo enfatizar que no se nos ha señalado ninguna disposición constitucional, estatuto u opinión oficialmente publicada de ningún tribunal de California que provea procesalmente a la mayoría de los miembros de este Tribunal el poder para recusar a uno o más de los restantes miembros del Foro. Tal procedimiento estaría cargado de peligro. La sola idea de un poder tan temible aterra.
>
> ¿Podría la mayoría de los miembros del Tribunal ejercer ese poder para recusar a otro miembro por razones puramente filosóficas o por diferencias políticas so color de prejuicio? Yo creo que no . . . . Simplemente, este tipo de poder no puede existir en la judicatura de una sociedad democrática. (Traducción nuestra.)

En fin, el Tribunal Supremo federal ha seguido históricamente en esta materia el criterio de que la decisión de inhibición es exclusiva del Magistrado recusado. A través de toda su historia ha prevalecido la norma de que el Tribunal no tiene poder para excluir a uno de sus miembros. *Laird* v. *Tatum,* 409 U.S. 824 (1972) (Memorando del Juez Rehnquist, a propósito de una moción sobre su recusación); *Jewell Ridge Corp.* v. *Local,* 325 U.S. 161 (1945) (El Juez Jackson en opinión concurrente sobre denegación de una reconsideración. Nota, *Justice Rehnquist's Decision to Participate in Laird* v. *Tatum,* 73 Colum. L. Rev. 106 (1973); J.P. Frank,

*Disqualification of Judges: In Support of the Bayh Bill*, 35 Law & Contemp. Prob. 43 (1970). Véase, también, W.H. Rehnquist, *The Supreme Court, How It Was, How It Is*, Nueva York, William Morrow and Co., 1987, págs. 65–68.

## II

Cualesquiera que sean los méritos comparados de otros sistemas, examinemos las premisas sobre las que se asienta nuestro régimen judicial.

Primero, este Tribunal es de origen constitucional y dentro de ese esquema ocupa una posición insustituible en el sistema de distribución y equilibrio de poderes públicos. Por génesis constitucional, el Tribunal Supremo es "el tribunal de última instancia en Puerto Rico". Art. V, Sec. 3, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 356. Entre los miembros de la Convención Constituyente prevaleció el criterio que "la existencia y organización de un tribunal de última instancia deben ser garantizadas en la constitución misma". Informe de la Comisión de la Rama Judicial, 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2608 (1951). Véase, Escuela de Administración Pública, *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 460.

Al cumplir con nuestra función constitucional, los jueces de este Foro tenemos por juramento una misión fundamental de expresión sobre los asuntos de honda repercusión pública que se someten vía los adecuados mecanismos jurisdiccionales. A diferencia del tribunal de primera instancia, la inhibición de un Juez de este Cuerpo no conlleva la corriente práctica de *sustitución* de magistrados que allí impera con relativa facilidad. Nuestras decisiones exigen quórum y votación mayoritaria, ya actuemos en pleno o divididos en salas. Ver Regla 6 de nuestro Reglamento, 4

L.P.R.A. Ap. I-A, y Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1. En todo caso, la exigencia de composición mínima y de mayoría absoluta para decretar la inconstitucionalidad de una ley, conlleva que la inhibición de un Juez de este Tribunal revista interés excepcional. Ver *Sánchez Rodríguez* v. *López Jiménez*, 116 D.P.R. 172 (1985).

 Segundo, el carácter vitalicio de nuestro nombramiento nos asegura una posición definida de independencia judicial, libre de las presiones políticas que pueden gravitar sobre un candidato a otro término judicial. J. Castán Tobeñas, *Poder Judicial e Independencia Judicial*, Madrid, Inst. Ed. Reus, 1951, pág. 24; *Negrón Soto* v. *Gobernador*, 110 D.P.R. 664 (1981). La Convención Constituyente abordó el tema con deliberada claridad y expresamente destacó que el nombramiento de por vida de los Jueces del Tribunal Supremo proveería la estabilidad requerida para asegurar la independencia judicial consagrada en el Art. V de la Constitución, *supra*. 1 Diario de Sesiones de la Convención Constituyente 452 (1951).

 Tercero, los Jueces de este Tribunal estamos sujetos a los preceptos constitucionales y a las normas legales y jurídicas establecidas. Nuestras decisiones requieren mayoría y la formación de una voluntad colectiva si han de ser las *opiniones del Tribunal*. Esto no ocurre así en los tribunales de instancia. El mecanismo colegiado asegura una justicia imparcial, serena restricción y celosa fiscalización de criterios. El recurso al disenso vehemente o al voto particular con sus modalidades, de amplia afirmación y utilización por este Tribunal, garantizan que la decisión final certificada responda al legítimo criterio mayoritario informado, nunca a la situación individual o preferencias privadas de los componentes del Tribunal. Véase Regla 4 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A.

██ Las normas de inhibición, tendentes a eliminar el potencial de prejuicio, arbitrariedad y a establecer las garantías de una decisión justa para las partes, imponen principios de conducta que van dirigidos a la conciencia judicial individual. En la gran mayoría de los casos en el seno de este Foro los Jueces han declarado su inhibición o su no intervención *sua sponte* sin mediar petición a los efectos. Siempre ha existido un total poder de apreciación individual sobre la procedencia de la inhibición formalmente solicitada, o las provistas por la Regla 3(e) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A. En fin, tradicionalmente entre los miembros de este Tribunal siempre ha prevalecido el principio de que "[c]ontra los estados de inhibición moral no puede imperar la regla de la necesidad". *Pizarro Ortega* v. *Tribunal Superior*, 100 D.P.R. 774, 776 (1972); *In re Andréu Ribas*, 81 D.P.R. 90, 124 (1959); *Santiago* v. *Superintendente de la Policía*, 112 D.P.R. 205, 212 (1982); *Colegio de Abogados de P.R.* v. *Schneider*, 112 D.P.R. 540, 561 (1982).

██ Esta práctica está a tono con la mejor doctrina y precedentes. No vemos fundamentos que ameriten alterarla. Por el contrario, razones de peso también percibidas por la mayoría de los foros colegiados estatales de última instancia y el propio Tribunal Supremo federal, nos obligan hoy a reafirmarla. La decisión sobre la recusación de un Juez de este Tribunal es individual y no plenaria. Corresponde a él y su conciencia resolver cualquier planteamiento de esta índole.

Por las razones expuestas anteriormente, *resolvemos que la moción de inhibición debe ser remitida al Juez Presidente para su oportuna consideración.*

El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Rebollo López no intervinieron.